**WILLIAM H. THOMAS (ISB 3154)**
**THOMAS, WILLIAMS & PARK, LLP**
**121 N. 9th St., Ste. 300**
**P.O. Box 1776**
**Boise, ID  83701-1776**
**Telephone:  (208) 345-7800**
**Fax:  (208) 345-7894**
**wmthomas@thomaswilliamslaw.com**

**Attorneys for Plaintiff**


# THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS W. FALASH, an individual, | Case No. _____ |
| Plaintiff, | |
| vs. | |
| INSPIRE ACADEMICS, INC., an Idaho non-profit corporation; CONNECTIONS EDUCATION, LLC, a Delaware corporation; CONNECTIONS ACADEMY OF IDAHO, LLC, an Idaho corporation; JILL HAMILTON, individually and as Director and President, Inspire Academics, Inc.; DIANA PLANE, individually and as Director, Inspire Academics, Inc.; MARCIA ROWE, individually and as Director, Inspire Academics, Inc.; GERALD CHOUINARD, individually and as Principal, Inspire Academics, Inc.; TONYA WESLEY, individually and as Senior Manager of Employee Relations, Connections Education, LLC; | **COMPLAINT WITH DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, Thomas W. Falash, for his complaint against Defendants, claims and alleges:

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 1**

## JURISDICTION AND VENUE

1.        This is a civil action over which this Court has original jurisdiction under 28 U.S.C. §1331 because it arises under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA" or "IDEIA"), as amended 20 U.S.C. §§ 1400 *et seq.* Jurisdiction is vested in this Court under 20 U.S.C. § 1415(i)(2).

2.        This action also seeks redress under 42 U.S.C. § 1983 for the deprivation, under color of state law, of rights, privileges and immunities secured by federal statutes and the United States Constitution, including due process rights under the Fourteenth Amendment of the United States Constitution.

3.        This action also seeks to redress retaliation, discrimination and interference with rights based on disability and the right to advocate under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504"). This action also seeks to address discrimination under Title II of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq.*, and other laws of the United States.

4.        The jurisdiction of this Court is invoked under 28 U.S.C. sections 1331, 1343(a)(3) and 1343(a)(4). This Court has supplemental pendent lite jurisdiction over all other claims under Idaho law alleged under 28 U.S.C. § 1367, because they form part of the same case or controversy as the aforementioned claims.

5.        Venue in this Court is proper under 28 U.S.C. § 1391(b) and under D.Id.L.Civ.R. 3.1. because some or all of the defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

6.      Plaintiff was a resident of Ada County, Idaho, when the events occurred and is still a resident of Ada County.

7.      Plaintiff was employed as Manager of Special Education for Defendant Inspire Academics, Inc. ("Inspire") under an administrative contract governed by I.C. § 33-513.

8.      Plaintiff had a constitutionally protected property interest in his employment.

9.      Defendant Inspire Academics, Inc. ("Inspire") is an Idaho nonprofit corporation.

10.     The Idaho Charter School Commission approved a charter school for Inspire and authorized it to operate as a local educational agency ("LEA").  The Idaho Department of Education approved the charter under Idaho Code Title 33, Chapter 52.  The charter authorizes Inspire to provide a statewide virtual education program. As an LEA, Inspire provides school children full and equal access to the public education programs it offers. Inspire must comply with the requirements of state and federal law and provide students eligible for special education a "free, appropriate public education" ("FAPE") under IDEA.

11.     Inspire's principle place of business is located at 600 N. Steelhead Way, Suite 164, Ada County, Boise, Idaho.

12.     Inspire is projected to receive approximately $3.8 million from the Idaho general funds for its operations during the 2013-2014 school year.  Inspire will receive at least $250,000 in Federal funds.

13.     Defendant Connections Education, LLC, known until January 2011 as Connections Academy, LLC, is a Delaware corporation. Connections Education, LLC's principle place of business is located at 1001 Fleet Street, 5th Floor, Baltimore, Maryland. Defendant Connections Academy of Idaho, LLC is an Idaho corporation. Connections Academy of Idaho,

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 3**

LLC's principle place of business is located at 1001 Fleet Street, 5th Floor, Baltimore, Maryland. Upon information and belief, Connections Education, LLC is the sole member and manager of Connections Academy of Idaho, LLC. Defendant Connections Education, LLC and Defendant Connections Academy of Idaho, LLC are referred to in this Complaint collectively as "Connections."

      14.    Connections contracts with Inspire to fully manage and operate the charter school. Connections manages all human resource services for Inspire. Of the total state and federal funds Inspire receives, the charter school, upon information and belief, will pay close to $2.2 million to Defendant Connections for "purchased services."

      15.    On or about July 1, 2010, Inspire entered into a "Revised Products and Professional Services Agreement Between Inspire Academics, Inc., Connections Academy, LLC, and Connections Academy of Idaho, LLC ("Contract")." Attached to this Complaint, as **Exhibit A,** is a copy of the Contract between Defendants Connections and Inspire. By this reference all terms and conditions of the Contract are incorporated into this Complaint as though the Contract was set forth in full. Under the Contract, Inspire delegated to Connections all delegable services, responsibilities, duties, powers and authority it had under Inspire's charter from the Idaho Charter School Commission. Connections is also responsible for providing school children with full and equal access to the public education system in compliance with the requirements of state and federal law.  In addition, Connections provides students eligible for special education with a "free, appropriate public education" (FAPE) under the IDEA.

      16.    Defendant Connections was a state actor and engaged in state action. Upon information and belief, Connections owns and manages virtual charter schools in more than twenty (20) other states.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 4**

17.     Defendant Board of Directors of Inspire Academics, Inc. (the "Board") is, and at all times was the duly constituted and acting governing board of Inspire.  The Board retains responsibility for the education of students attending Inspire.

18.     At all times hereto, Defendant Jill Hamilton ("Hamilton"), was a citizen and resident of Ada County, Idaho:

18.1    Hamilton is sued in both her individual and official capacities;

18.2    Hamilton was a member of the Board. Hamilton has been president of the Board;

18.3    Hamilton was a person acting under color of State law for purposes of 42 U.S.C. § 1983;

18.4    Hamilton acted in her official capacities as Director and President of the Board and participated in the governmental process and decisions alleged in this Complaint;

18.5    Hamilton acted as final policymaker.

19.     At all relevant times hereto, Defendant Diana Plane ("Plane"), was a citizen and resident of Gem County, Idaho:

19.1    Plane is sued in both her individual and official capacities;

19.2    Plane was a member of the Board;

19.3    Plane was a person acting under color of State law for purposes of 42 U.S.C. § 1983;

19.4    Plane acted in her official capacity as Director and participated in the governmental process and decisions alleged in this Complaint;

19.5    Plane acted as final policymaker.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 5**

20.     At all relevant times hereto, Defendant Marcia Rowe ("Rowe"), was a citizen and resident of Boise County, Idaho:

     20.1     Rowe is sued in both her individual and official capacities;

     20.2     Rowe was a member of the Board;

     20.3     Rowe was a person acting under color of State law for purposes of 42 U.S.C. § 1983;

     20.4     Rowe acted in her official capacity as Director and participated in the governmental process and decisions alleged in this Complaint;

     20.5     Rowe acted as a final policymaker.

21.     Defendant Gerald Chouinard ("Chouinard") was a citizen and resident of Ada County, Idaho:

     21.1     Chouinard is sued in both his individual and official capacities;

     21.2     At all relevant times hereto, Chouinard was employed as Principal of Inspire Academy;

     21.3     Chouinard had the power and responsibility to provide all students attending Inspire equal access to public education;

     21.4     Chouinard had the responsibility to ensure that eligible students received special education and related services (FAPE) under IDEA;

     21.5     Chouinard was responsible for supervising teachers and staff at Inspire to ensure they provide FAPE to disabled students;

     21.6     Chouinard had the duty to ensure that teachers and staff at Inspire were free from retaliation for advocating for students' rights;

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 6**

21.7    Chouinard had the duty to ensure that teachers and staff would not be interfered with in their right to advocate for students;

21.8    Chouinard was a person acting under color of State law for purposes of 42 U.S.C. § 1983;

21.9    Chouinard acted in his official capacity as Principal and participated in the governmental process and decisions alleged in this Complaint.

21.10   Chouinard acted as a final policymaker.

22.    Upon information and belief, at all relevant times hereto, Defendant Tonya Wesley ("Wesley") was a citizen and resident of Baltimore County, Maryland:

22.1    Wesley is sued in both her individual and official capacities;

22.2    Wesley was the Manager of Employee Relations and/or Senior Manager for Connections Education, LLC during Plaintiff's employment with Inspire;

22.3    Wesley's job responsibilities included working with Inspire employees and managers on performance related issues, employee and manager coaching and development;

22.4    Wesley's job responsibilities also included responding to issues or complaints from Inspire employees and/or managers;

22.5    Wesley was a person acting under color of State law for purposes of 42 U.S.C. § 1983;

22.6    Wesley acted in her official capacity as Senior Manager of Employee Relations and participated in the governmental process and decisions alleged in this Complaint;

22.7    Wesley acted as a final policymaker.

## AIDING AND ABETTING

23.     Each Defendant aided and abetted, encouraged, and rendered substantial assistance to the other defendants in breaching their obligations to Plaintiff and in violating the law.  In taking action, as alleged, to aid and abet and substantially assist the commissions of these wrongful acts and wrongdoing complained of, each defendant acted with an awareness of his, her or its primary wrongdoing and realized his, her or its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals and wrongdoing.

## CONSPIRACY

24.     Defendants, and each, knowingly and willfully conspired, engaged in a common enterprise and engaged in a common course of conduct to accomplish the wrongs complained of. The purpose and effect of the conspiracy, common enterprise and common course of conduct complained of was, *inter alia*, to deprive Plaintiff of his rights under the United States Constitution.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of, and knew of its overall contribution to and furtherance thereof.  Defendants' wrongful acts include, *inter alia*, all of the acts that each is alleged to have committed in furtherance of the wrongful conduct complained of.

## FACTUAL BACKGROUND

25.     On or about August 8, 2012, Plaintiff was hired as Manager of Special Education under an Administrator Contract executed in August 2012.  Attached hereto as **Exhibit B,** is a true and correct copy of the State of Idaho, Administrator Contract.  Inspire and Connections continued Plaintiff's employment for the 2013-2014 school year with an Administrator Contract executed in August 2013.  Attached hereto, as **Exhibit C,** is a true and correct copy of the State

of Idaho Administrator Contract.  Plaintiff continued his employment until he was terminated September 17, 2013.

26.     Prior to Plaintiff's employment, Idaho State Department of Education  sent Inspire a notice of noncompliance on or about May 15, 2010.  The notice specified that Inspire was not compliant with special education requirements.

27.     Subsequent to Plaintiff starting his employment, Plaintiff learned that Inspire's Individualized Education Programs (IEPs), required by IDEA, Section 1414(d), 20 U.S. C. 1412(a)(4) for each special education student, were incomplete from the 2011-2012 school year and that Inspire had not remedied the other deficiencies identified by the Idaho State Department of Education special education compliance audit.

28.     Starting in August 2012, Plaintiff advised Chouinard of the violations regarding special education students' disenrollment procedures and failure to comply with IEPs.  Plaintiff also reported the nature and extent of the violations to Wesley and other Connections supervisors.

29.     Plaintiff provided Inspire and Connections with the information and requirements to become legally compliant with state and federal regulations and laws applicable to special education students.

30.     Special education students are guaranteed specific procedural processes before disenrollment from an educational program.  In August 2012, Plaintiff reported violations regarding Inspire's disenrollment procedures and policies applicable to special education students to Chouinard, Vice-Principal Wade Frogley ("Frogley"), Tracy Broccolino ("Broccolino") and Elise Mohler ("Mohler"), Special Education Supervisors with Connections

Education and to Bill Morriss ("Morriss"), Coordinator Charter Schools, Special Education Division, State of Idaho Department of Education.

31.     On or about August 14, 2012, Plaintiff again reported Inspire's noncompliant disenrollment procedures for special education students to Chouinard and Frogley.  Plaintiff told Chouinard and Frogley the procedures violated the IDEA, Section 504, ADA, state law and applicable board policy; specifically but not limited to IDEA, 20 USC 11-1415(k) and 34 CFR 300.

32.     In response to Plaintiff's reports of legal violations, Chouinard directed Plaintiff to focus on current students and applicable records, and not to address past wrongdoing.

33.     In September 2012, Plaintiff again notified Connections of Inspire's special education violations and reviewed the administrative procedures necessary to comply with federal law and regulations with Chouinard and Frogley.

34.     On or about October 2012, Plaintiff informed Morriss that Inspire's special education disenrollment policy violated the IDEA, Section 504, ADA, state law and applicable board policy.

35.     In late 2012 and early 2013, Plaintiff worked to correct Inspire's non-compliant IEPs.

36.     In March 2013, Plaintiff created a legally compliant disenrollment procedure which he submitted to Connections for approval.  Connections approved it.  Plaintiff provided the approved and compliant disenrollment procedures to Chouinard and the Board.  However, Plaintiff's recommended procedures were not implemented.

37.     Chouinard gave Plaintiff his annual performance evaluation in June 2013 and renewed Plaintiff's employment contract for the 2013-2014 school year.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 10**

38.     On or about June 18, 2013, Inspire issued a Notice of Recommendation of Probation ("Notice") placing Plaintiff on probation from June 18 until August 18, 2013  alleging that Plaintiff failed to follow regulatory compliance guidelines and that special education services were not consistently provided to students with IEPs. The Probationary Plan of Assistance ("Probationary Plan"), issued at the same time as the Notice, required Plaintiff to adhere to IDEA, state guidelines and Connections' protocol to ensure regulatory compliance.

39.     The Notice falsely accused Plaintiff of violating Inspire/Connections' personnel rules and advised him to improve his communications and interactions with fellow employees.

40.     Chouinard also created a performance intervention plan ("PIP").  The PIP referenced no regulatory violations or corrective plans.  The PIP only addressed Plaintiff's interactions with employees.

41.     In July and August 2013, Chouinard restricted Plaintiff's work assignments:

41.1     He required Plaintiff to quit the Idaho Interagency Council on Secondary Transition to which he had been appointed;

41.2     Required Plaintiff to cancel previously approved plans to be a guest presenter at a state-wide special education meeting;

41.3     Prohibited Plaintiff from communicating with anyone, besides Connections special education department, without Chouinard's prior approval;

41.4     Frogley was to attend all special education department meetings;

41.5     Chouinard or Frogley had to approve Plaintiff's email communications;

41.6     Plaintiff was prohibited from seeking programming assistance from Idaho Autism Outreach Project for the autistic students attending Inspire;

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 11**

41.7    Chouinard took over Plaintiff's supervision of Inspire's special education department staff; and,

41.8    Removed AIMSweb (monitoring tool) access and responsibilities so Plaintiff could not monitor individual IEP goals.

42.    In August 2013, Plaintiff asked Chouinard why Inspire and/or Connections had delayed processing the paperwork for special education students which resulted in missed instruction time and educational services that did not comply with IEPs.

43.    In September 2013, Plaintiff asked Broccolino why deaf special education students were not given individual computers in order to deliver services in compliance with IEPs.  Inspire and Connections denied Plaintiff's request that individual computers be provided to special education students and Chouinard told Plaintiff if he wrote individual computers into deaf students' IEPs he would be disciplined and/or fired.

44.    In September 2013, Plaintiff complained to Chouinard about Inspire's noncompliant gifted and talented policy to determine eligibility for the program.  Initially, Chouinard approved Plaintiff's revised policy. However, after staff complaints about the new procedures, Chouinard directed Plaintiff to not implement the policy changes.  As a result, Inspire was in violation of IDAPA § 08.02.03.171.

45.    Plaintiff met with Chouinard in early September 2013, to review his PIP. During the meeting Chouinard did not warn or discuss terminating Plaintiff's employment.

46.    As of September 9, 2013, Chouinard signed a Recommendation to the Board of Trustees recommending the Board discharge Plaintiff under I.C. § 33-513.

47.    September 17, 2013,  Chouinard and Jennifer Dukek, Connections' Area Director, met with Plaintiff and told him that Chouinard had prepared a recommendation to fire Plaintiff.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 12**

Chouinard said he would make his recommendation to the Board that evening.  Chouinard read

the charges to Plaintiff but would not give him a copy.  He placed Plaintiff on administrative

leave.  At the Inspire Board meeting, however, the Board did not vote to approve Chouinard's

recommendation to place Plaintiff on involuntary leave.

48.     September 18, 2013, the Board issued a Notice of Recommendation for Discharge

and Notice of Hearing to Plaintiff.

49.     The reasons identified in the Recommendation of Discharge included failure to

complete regulatory compliance of the SPED program and alleged insensitive interactions with

co-workers.

50.     September 18, 2013, Plaintiff wrote to Wesley identifying his ongoing concerns

regarding Inspire's special education program violations of federal and state law and complained

that the disciplinary actions were taken in retaliation for pursuing these issues.  Plaintiff

additionally asked Wesley to investigate the noncompliance issues.  Attached hereto, as **Exhibit**

**D,** is a copy of Plaintiff's letter to Wesley.

51.     October 4, 2013, Wesley sent Plaintiff a letter acknowledging receipt of his

September 18, 2013 letter.  Wesley confirmed her direct involvement in the recommendation of

discharge and indicated she would investigate his complaints, and then follow up with him.

Attached hereto, as **Exhibit E,** is a copy of Wesley's letter to Plaintiff.

52.     Connections posted a job opening for Plaintiff's position as Manager of Special

Education at Inspire Academics on October 25, 2013.

53.     Plaintiff's administrative contract is governed by I.C. § 33-513 which requires a

due process hearing prior to discharging a certificated professional during the contract year.

Upon information and belief, in violation of I.C. § 33-513(5), Connections and Inspire decided to

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 13**

terminate Plaintiff in September 2013, three months prior to the due process hearing held on December 5, 2013.

54.      At the hearing on December 5, 2013, Wesley and Chouinard testified regarding the alleged incidents involving co-workers.  The accusing co-workers involved in the alleged incidents did not testify and Plaintiff was unable to cross-examine them.

55.      At the December 5, 2013 hearing, Chouinard testified that he knew about the special education violations but did not implement Plaintiff's recommended changes.

56.      The Board of Trustees confirmed Plaintiff's discharge, based on hearsay and unsubstantiated anonymous tips allegedly called into the Connections' employee hotline.

57.      Plaintiff filed a complaint with the State Department of Education regarding Inspire's special education noncompliance issues.  The State Department of Education issued a letter determining that Inspire did not comply with applicable regulatory requirements.  On March 31, 2014, Inspire submitted a Corrective Action Plan in response to the State's allegations and identified deadlines by which Inspire must be compliant.

### Violation of Plaintiff's 14th Amendment to the United States Constitution- Due Process Rights, 42 USC § 1983 (All Defendants)

58.      Plaintiff incorporates by reference each allegation above as though fully set forth herein.

59.      Plaintiff, employed as a certificated administrator under his renewable employment contract, has a protected property interest in his continued employment under Idaho law.  This property interest is protected by the due process clause of the Fourteenth Amendment of the U.S. Constitution.

60.    All Defendants are state actors whom proximately caused the due process violation, termination of Plaintiff's employment prior to a fair hearing.  The post-termination hearing additionally violated Plaintiff's due process rights for failure to provide a hearing before an impartial tribune.

61.    Inspire is a public charter school created under State of Idaho laws that can be sued as any other public entity and is a state actor.  Connections is a state actor based on its close nexus to and its contractual agreements with Inspire.

62.    Connections provides the human resources department for Inspire and completes these actions as an employer, including but not limited to:

62.1    Manages and oversees employee hiring, discipline, and termination;

62.2    Creates and provides employees with the employee manual, employment policies and practices for Inspire and Connections and its other affiliated corporate entities; and,

62.3    Directs Inspire's staff to contact Connections' Human Resources in order to resolve employee complaints or issues.

63.    Wesley was directly involved in the adverse actions against Plaintiff.  Wesley recommended terminating Plaintiff prior to a due process hearing.  Wesley was Connections' witness at the December 5, 2013, hearing and testified in support of Plaintiff's termination.

64.    Connections is a state actor because it provided a public function by operating a public charter school, a power traditionally reserved for the State of Idaho.

65.    Connections is intertwined with Inspire because it manages and operates Inspire through its provision of, *inter alia,* a proprietary curriculum, lesson plans, testing materials, school management system, student data management, and training of board members and staff.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 15**

As further alleged with particularity, Connections oversees the employee hiring, discipline and employee termination procedures.

66.     Connections is financially intertwined as it receives revenues from Inspire, which is funded by public monies. Connections and Inspire have a close nexus or symbiotic relationship and their financial success depends on the actions of the other.

67.     The reasons for Plaintiff's termination were pretextual and he was terminated in retaliation for his whistleblowing activities, which included reporting violations of laws and regulations applicable to educational services provided to special education students.

68.     Defendants arbitrarily and capriciously deprived Plaintiff of his property interest without procedural due process in violation of the Fourteenth Amendment of the United States Constitution by terminating him without just cause and without the opportunity to be heard prior to termination.

69.     Plaintiff had no opportunity to be heard before an impartial tribunal.  Connections and Inspire's Board decided to terminate Plaintiff and terminated him in September 2013.

70.     Inspire and Connections, as a school district, are governed by Idaho open meeting laws.  I.C. § 67-2341(4).  Inspire and Connections violated the procedures identified in I.C. § 67-2345 for convening an executive session to consider the recommendation to discharge Plaintiff. Inspire and Connections did not properly move to enter into the executive session.  The motion, roll call vote and the vote were not recorded in the minutes as required by I.C. § 67-2345. Inspire and Connections also violated I.C. § 67-2345 as members of the public, in addition to Inspire's members of the Board, attended the executive session.  As the minutes reflect, persons that attended included Mr. Chouinard, Mr. Nguyen, Ms. Wesley, Ms. Duke, Ms. Arthur, and Ms. Hurst.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 16**

71.     Inspire and Connections violated the procedural safeguards identified in I.C. § 33-513 governing Plaintiff's employment under his administrator contract.  Inspire and Connections acted upon the truth of the allegations in the recommendation of discharge and terminated Plaintiff on September 17, 2013 without a hearing before an impartial tribunal.  On September 17, 2013, Plaintiff was immediately placed on administrative leave after verbal notification of the recommendation of discharge.  The Board did not ratify at the next Board meeting, placing Plaintiff on administrative leave and violated I.C. § 33-517(7).

72.     By reason of the foregoing Constitutional violations, Plaintiff has suffered immediate and irreparable injury to his person resulting in the deprivation of his constitutional rights, privileges and immunities.  Plaintiff experienced humiliation, degradation, mental distress, financial loss, loss of reputation, slander, defamation and severe emotional anguish for which Defendants are jointly and severally liable.

73.     Under 42 U.S.C. 1988(b), Plaintiff may recover his reasonable attorney fees as part of his costs in prosecuting his claims.

**Violation of the Rehabilitation Act, 29 USC 794
(All Defendants)**

74.     Plaintiff incorporates by reference each allegation above as though fully set forth herein.

75.     Inspire and Connections violated Section 504, the Rehabilitation Act by terminating Plaintiff in retaliation for Plaintiff advocating on behalf of special education students, for reporting potential violations of applicable federal and state laws, specifically violations of the Rehabilitation Act and for denying FAPE to special education students by failing to appropriately complete and implement IEPs besides failing to implement appropriate disenrollment procedures for disabled students.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 17**

76.     Inspire and Connections are operators of "programs and activities" receiving federal funding and have discriminated against disabled students in violation of the Rehabilitation Act, 29 USC 794(a).  Inspire and Connections are liable by respondeat superior for the actions of its employees and agents, namely the Board, Hamilton, Plane, Rowe, Chouinard and Wesley.

77.     Plaintiff engaged in protected activity, advocating for protecting the rights of special education students, based on a reasonable, good faith belief that violations of the Rehabilitation Act occurred, as further alleged with particularity, including but not limited to:

77.1     Starting in August 2012, Plaintiff communicated to Chouinard, Frogley, Broccolino and Mohler, and Morriss, violations regarding the disenrollment procedures and policies applicable to special education students;

77.2     Starting in September 2012, and continuing thereafter, Plaintiff reported violations of federal and state laws to Chouinard, Wesley, and Frogley and the need to implement administrative procedures to comply with federal law and regulations;

77.3     In October 2012, Plaintiff reported to Morriss Inspire's withdrawal policy violations;

77.4     On or about February 2013, Plaintiff worked to correct non-compliant IEPs and communicated his progress to Chouinard;

77.5     During March 2013, Plaintiff created a disenrollment procedure that he then sent to Connections for approval.  He also provided it to Chouinard and the Board. This procedure was not implemented;

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 18**

77.6    During August 2013, Plaintiff communicated with Chouinard that the delayed paperwork processing for special education students violated applicable law and resulted in missed instruction time in compliance with IEPs; and,

77.7    In September 2013, Plaintiff contacted Broccolino regarding the need for individual computers for special education students to deliver IEP services.  Defendants denied the request for individual computers to special education students.

78.    In retaliation for Plaintiff acting on behalf of special education students, as alleged with particularity, Defendants took the following adverse actions:

78.1    On June 18, 2013, Chouinard issued a Notice of Probation to Plaintiff;

78.2    During July and August 2013, Chouinard and Frogley effectively stopped communicating with Plaintiff making it difficult to complete his job;

78.3    During July and August 2013, Chouinard modified Plaintiff's work duties by: requiring him to remove himself from State of Idaho Department of Education council; requiring him to cancel speaking engagements at special education conferences; not allowing him to communicate with anyone outside of Connections' corporate office; assigning Frogley to monitor Special Education Department meetings and review any emails written by Plaintiff; removing his supervision responsibilities for Special Education Department staff; and, removing AIMSweb responsibilities necessary for monitoring student goals on IEPs;

78.4    In September 2013, Chouinard threatened Plaintiff with discipline or termination if he included the need for individual computers in special education students' IEPs;

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 19**

78.5    On or about September 23, 2013, Chouinard and Jennifer Dukek, Area

Director, Connections Education, met with Plaintiff to read charges against him with a

recommendation of discharge and placed Plaintiff on administrative leave; and

78.6    Following an alleged due process hearing on December 5, 2013 Plaintiff

was again terminated on or about January 14, 2014.

79.    As a direct and proximate result of Defendants' deliberate and intentional

violations of laws applicable to special education students and the adverse actions against him,

Plaintiff incurred damages for which he may recover.

80.    Under 29 U.S.C. 794a(b), Plaintiff may recover his reasonable attorney fees as

part of his costs in prosecuting his claims.

### Violation of the Americans with Disabilities Act (ADA), Title II
### 42 U.S.C. 12132
### (All Defendants)

81.    Plaintiff incorporates by reference each allegation above as though fully set forth

herein.

82.    In violation of 28 C.F.R. 35.134(a), Defendants discriminated against Plaintiff for

engaging in activities on behalf of disabled students, including his opposition to the treatment of

special education students and Plaintiff's communications to Inspire and Connections that

special education policies and practices violated the ADA.

83.    In violation of 28 C.F.R. 35.134(b), Inspire and Connections threatened Plaintiff

and interfered with his employment, ending with termination, in retaliation for advocating on

behalf of disabled students receiving inadequate public services, educational services provided

by Inspire, a public charter school, and Connections.

84.     Inspire and Connections are liable by respondeat superior for the illegal actions taken against it by the individual Defendants.

85.     As a direct and proximate result of Defendants' deliberate and intentional violations of the ADA, and the adverse actions against him, Plaintiff incurred damages for which he may recover.

86.     Under 29 U.S.C. 794a(b), Plaintiff may recover his reasonable attorney fees as part of his costs in prosecuting his claims.

### Violations of Idaho Code 6-2101, et seq., Protection of Public Employees
### (All Defendants)

87.     Plaintiff incorporates by reference each allegation above as though fully set forth herein.

88.     Plaintiff, employed as a certificated administrator, is a "public employee" privy to the protections of I.C. § 6-2101, et seq., engaged in protected activity, as alleged in this Complaint.

89.     Inspire and the Defendants acting as agents for Inspire are "employers" as defined in I.C. § 6-2103(4).

90.     Plaintiff, as alleged with particularity above, communicated in good faith and in a timely manner the violation or suspected violation of a law, rule or regulation adopted under the law of Idaho, a political subdivision of Idaho or the United States, and violations of the ADA, IDEA and Rehabilitation Act.

91.     As a direct and proximate result of Plaintiff's communications regarding the ADA, IDEA and Rehabilitation Act violations and violations regarding the special education students and services, Defendants took adverse actions against Plaintiff, and terminated his employment.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 21**

92.     As a direct and proximate result of Defendants' adverse actions against him, Plaintiff incurred damages for which he may recover.

93.     Under the Idaho Protection of Public Employees Act, Plaintiff may recover his reasonable attorney fees as part of his costs in prosecuting his claims.

### Tortious Interference with Contract/Prospective Advantage
### (Connections, Tonya Wesley)

94.     Plaintiff incorporates by reference each allegation above as though fully set forth.

95.     Plaintiff was employed with Inspire and Connections pursuant to an Administrator Contract.  Wesley and Connections were aware of the Contract with Plaintiff.

96.     Wesley admitted to participation in and recommendation of Plaintiff's termination.

97.     Wesley intentionally and wrongfully recommended and pursued the termination of Plaintiff's contract with Inspire and Connections.  Wesley wrongfully pursued Plaintiff's termination based on the negligent investigation of employee complaints and did so in retaliation for Plaintiff's whistleblowing regarding the special education program regulatory noncompliance.

98.     Wesley's recommendation that Plaintiff be terminated caused and/or induced the termination of Plaintiff's employment in breach of the employment contract and procedures governing termination.

99.     Wesley's actions were intentionally intended to interfere with any prospective economic advantage available to Plaintiff.  Wesley knew of Plaintiff's economic expectancy of continued employment for the duration of the contract.  Wesley wrongfully interfered with Plaintiff's economic expectancy.

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 22**

100.     As a direct and proximate result of Wesley's tortious conduct, Plaintiff suffered, and will continue to suffer, substantial injuries and damages for which he is entitled to recovery.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court enter judgment against all Defendants in their official capacities and individual capacities for the following relief on the causes of action set forth:

1.     An award of attorney fees and litigation costs under 42 U.S.C. § 1988,  29 U.S.C. 794a(b), and Idaho Protection of Public Employees Act;

2.     Monetary damages for back pay, benefits, future financial loss, mental and emotional distress suffered, and punitive damages;

3.     Prejudgment interest; and,

4.     That Plaintiff has such other and further relief as this Court may deem proper.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues under Federal Rule of Civil Procedure 38(b).

DATED this 5th day of June, 2014.

THOMAS, WILLIAMS & PARK, LLP



William H. Thomas
Attorneys for Plaintiff

**COMPLAINT WITH DEMAND FOR JURY TRIAL – Page 23**

# EXHIBIT A

# REVISED PRODUCTS AND PROFESSIONAL SERVICES AGREEMENT BETWEEN INSPIRE ACADEMICS, INC.,  CONNECTIONS ACADEMY, LLC, AND CONNECTIONS ACADEMY OF IDAHO, LLC
## (7|1 , 2010)

**THIS REVISED PRODUCTS AND PROFESSIONAL SERVICES AGREEMENT** ("Agreement") is , made and entered into by and among **INSPIRE ACADEMICS, INC.,** an Idaho nonprofit corporation, (the "Charter School") and **CONNECTIONS ACADEMY, LLC,** a Delaware limited liability company ("CA"), and **CONNECTIONS ACADEMY OF IDAHO, LLC** ("CAI"), (the Charter School and CA are hereinafter referred to as a "Party" or together "the Parties").

## RECITALS

**WHEREAS,** the Idaho Charter School Commission (the "Chartering Authority") approved a charter school for the Inspire Academics, Inc. and the charter has been approved by the Idaho Department of Education in accordance with Idaho statute Title 33, Chapter 52  (the "Charter School Law");

**WHEREAS,** the Charter School intends to offer a statewide virtual education program;

**WHEREAS,** CA provides innovative educational products and services outside the traditional classroom, emphasizing accountability and performance for students and staff;

**WHEREAS,** CA has a proven record of successfully managing the day-to-day provision of educational products and services;

**WHEREAS,** CA is an independent contractor and neither it nor any of its employees or agents is an employee or member of the Board of Directors of the Charter School or the Chartering Authority;

**WHEREAS,** the Charter School desires to contract with CA to provide such educational products and services as defined herein to certain eligible students qualifying for pupil enrollment and public funding under the Charter School Law or any other Idaho statute, and CA desires to contract with the Charter School to provide these services;

**WHEREAS,** the Charter School and CA are entering into this Agreement to set forth the obligations and duties of each Party with respect to the provision of Educational Products and Services by CA on behalf of the Charter School;

**WHEREAS,** the Professional Services Agreement between Inspire Academics Inc. and Connections Academy LLC was initially dated July 28, 2005 (the "Previous Agreement");

**WHEREAS,** CA desires to assign the Previous Agreement, as amended, consolidated and replaced herein, and delegate its performance to CAI, and the Charter School accepts such assignment and delegation; and

**WHEREAS,** the Parties wish to replace and supersede the Previous Agreement with this new Agreement.

**NOW THEREFORE,** in consideration of the foregoing, of the covenants and agreements contained in this Agreement, and for other good and valuable consideration, the sufficiency of which is acknowledged, the Parties agree as follows:

1.    <u>Definitions.</u>

1.1    **"Academic Year"** shall mean the school year as defined by the School Calendar. (see also Section 1.15)

1.2    **"Administrative Staff"** shall include the employees of the Charter School holding the positions described in Section 4.1.

1.3    **"Budget"** shall mean the operating budget for the Charter School as approved by the Charter School according to the provisions of Section 9.

1.4    **"Charter"** shall mean the Charter approved by the Chartering Authority on April 14, 2005.

1.5    **"Charter School"** shall mean Inspire Academics, Inc. as authorized by the Chartering Authority.

1.6    **"Chartering Authority"** shall mean the Idaho Charter School Commission.

1.7    **"Course(s)"** shall be comprised of a set of lessons and assessments including both tangible and intangible educational materials that shall meet the educational content or other standards established by the State of Idaho in order to be recognized for high school credit in grades 9-12 or for meeting educational requirements in grades K-8.

1.8    **"Educational Products and Services"** shall mean the Educational Products described in Section 2 and the Educational Services described in Section 3 of this Agreement.

1.9    **"Eligible Students"** shall the meaning set forth in Section 5 of this Agreement.

1.10    **"Effective Date"** shall be the date first written above.

1.11    **"Governing Board"** shall mean the Board of Directors of the Charter School.

1.12    **"Learning Coach"** shall mean a parent or legal guardian of the Student or another adult specifically designated by the Student's parent or legal guardian who will perform the responsibilities as defined in the Parent/Legal Guardian (Caretaker) Acknowledgement, and the School Handbook, both of which shall be reviewed and approved annually by the Governing Board. Learning Coaches are not employees or contractors of either the Charter School or CA and shall not receive any compensation for their services.

2

1.13    **"Performance Review"** shall mean a review of CA's performance under this Agreement, conducted at the Charter School's discretion; the design of the review, performance criteria and the methodology shall be developed by the Charter School in consultation with CA.

1.14    **"Personalized Learning Plan"** or **"PLP"** shall have the meaning set forth in Section 3.1 of this Agreement.

1.15    **"School Calendar"** shall be the days when the Educational Services under this Agreement will be delivered to Students, Teachers and Learning Coaches as defined by the School Handbook.   Charter School will operate on those days established to be the School Calendar for the Academic Year, except that Students may continue to report attendance during scheduled school holidays to the extent permitted under Idaho law. The School Calendar for each year is subject to prior approval by the Governing Board of the Charter School and shall meet any regulatory requirements for days and hours of instruction required by law or regulation.

1.16    **"Special Needs Students"** shall mean students who have been identified as disabled under the federal Individuals with Disabilities Education Act ("IDEA") or Section 504 of the federal Rehabilitation Act of 1973.

1.17    **"Students"** shall mean the children who are enrolled in the Charter School.

1.18    **"Student Records"** shall mean have the same meaning as educational records as defined in the Family Education Rights and Privacy Act, 20 USC 1232 g (a)(4)(A), "those records, files, documents, and other materials which (1) contains information directly related to a student; and are maintained by an educational agency or institution or by a person acting for such agency or institution".

1.19    **"Teachers"** are certificated persons employed by the Charter School, except for Teachers contracted with pursuant to Section 4.2, who provide educational instruction to Students.

1.20    **"Term"** shall have the meaning set forth in Section 6 of this Agreement.

2.    **Educational Products to be Provided by CA.**

CA shall provide the following Educational Products, at the prices set forth in Section 9, which may be adjusted from time to time at the mutual agreement of both Parties, and which Educational Products shall be first reviewed and approved by the Governing Board and may not be substantially altered without prior approval by the Governing Board.

2.1    Tangible Instructional Materials.  A non-exclusive, non-transferable, royalty-free, license to use tangible educational materials, which may include items such as textbooks, novels, science kits and other tangible educational materials provided during each applicable Academic Year during the Term of this Agreement for grades K-12 ("Tangible Instructional Materials"), as described in the CA Program Guide published by CA and updated annually ("Program Guide"). The Tangible Instructional Materials shall be reviewed and approved annually by the Governing Board. The Charter School acknowledges and agrees that CA and/or its vendors are the sole owners of the Tangible Instructional Materials and that any payments to CA for the use of the

3

Tangible Instructional Materials shall be solely for the applicable Academic Year for each Student and/or Teacher who receives Tangible Instructional Materials in connection with the provision by CA of the Educational Products and Services under this Agreement. This Agreement does not constitute a transfer of title or ownership rights by CA to the Charter School or to the Students or Teachers of the Tangible Instructional Materials. All right, title, and interest in and to the Tangible Instructional Materials and any content contained in the Tangible Instructional Materials, including, but not limited to, copyright, patent, trade secret, and trademark rights will remain with CA and/or its vendors. CA shall have the right to recover any reusable Tangible Instructional Materials at the conclusion of each Academic Year or when the Student is no longer enrolled, whichever is sooner. CA may invoice Students for any Tangible Instructional Materials that are not returned, unless prohibited by applicable law. To the extent that any Tangible Instructional Materials are listed in the Program Guide as being available in both physical and electronic form, CA may provide either version.

2.2     Intangible Instructional Materials. A non-exclusive, non-transferable, royalty-free, license to use intangible educational materials that may include items such as online lesson content, lesson plans, Teachlet® tutorials and other intangible educational materials included in any Courses listed in the Program Guide during each applicable Academic Year during the Term of this Agreement ("Intangible Instructional Materials"). The Intangible Instructional Materials shall be reviewed and approved annually by the Governing Board. The Charter School acknowledges and agrees that CA and/or its vendors are the sole owners of the Intangible Instructional Materials and that any payments to CA for the use of the Intangible Instructional Materials shall be solely for the applicable Academic Year for each Student and/or Teacher who receives Intangible Instructional Materials in connection with the provision by CA of the Educational Products and Services under this Agreement. This Agreement does not constitute a transfer of title or ownership by CA to the Charter School or to the Students or Teachers in the Intangible Instructional Materials. All right, title, and interest in and to the Intangible Instructional Materials and any content contained in the Intangible Instructional Materials, including, but not limited to, copyright, patent, trade secret, and trademark rights will remain with CA and/or its vendors.

2.3     Office Products and Supplies. CA shall provide a supplies allowance for any CA employees working from their homes. CA shall also supply a computer to any CA employees assigned to the School working from their homes or any CA employee assigned to work in the office space provided by CA for the operation of the School. ("Office Products and Supplies").

2.4     Computer Hardware and Software. The Charter School may lease from CA: (a) such computer hardware and/or software that shall meet or exceed any specifications in the Charter or required by law, for each Student who enrolls or household if more than one student in a household enrolls and (b) any hardware and/or software required by Administrative staff or Teachers (collectively "Hardware and Software"). Any Hardware and Software provided by CA will be the exclusive property of CA or its contractors and will be returned upon the termination of this Agreement or when the Student is no longer enrolled, whichever is sooner. The Hardware and Software may be updated from time to time with the approval of the Governing Board. The Charter School shall not be responsible for ensuring the return of Hardware or Software supplied by CA to Students but will be responsible for returning any Hardware or Software provided to Administrative Staff or Teachers. However, to the extent that such Hardware or Software is not

4

recovered, CA may invoice Students, or in the case of Hardware or Software provided to Teachers or Administrative Staff, the Charter School, unless prohibited by law for any Hardware or Software not returned. CA and the Charter School shall cooperate to ensure that Hardware and Software are, to the extent possible, recovered, and that no Student, Learning Coach Administrative Staff or Teachers obtain ownership of any such Hardware or Software. The Charter School may also elect to purchase its own Hardware or Software, and contract with CA to manage such Hardware or Software. If the Charter School elects to purchase or lease Computer Hardware and/or Software for use by Students, Administrative Staff or Teachers, it agrees that such Hardware or Software will meet or exceed the same specifications as that offered to the Charter School for lease by CA.

**3.    Educational Services.**

During the Term, CA shall provide or cause to be provided to the Charter School the following Educational Services for the fees set forth in Section 9, which may be adjusted from time to time at the mutual agreement of both Parties:

3.1    Personalized Learning Plan Protocol. A Personalized Learning Plan ("PLP") for each Student as required to meet or exceed any educational standards established by the State of Idaho or required by the Charter.

3.2    Assessments. A series of assessments administered to Students to gauge mastery of core concepts and readiness for the State of Idaho's standardized tests including: (a) a placement evaluation; (b) a skills assessment for grades 3-8 designed to measure annual progress a Student's level against state standards, which will generally be administered to Students enrolled during the first two (2) months of the Academic Year and those enrolled during the last two (2) months of the Academic Year; (c) other quantitative and qualitative assessments that will vary based on the grade and the Student's progress as shall be mutually agreed upon by the Charter School and CA; (d) Progress Reports that shall be prepared for each Student at least quarterly and shall meet or exceed any specifications in the Charter.

3.3    Standardized Tests. All Students shall be required to participate in the State of Idaho's standardized tests to the same extent as students enrolled in any other Idaho public school. CA shall be responsible for establishing a testing plan that provides reasonable access to testing sites based on the Student's residence that shall be included in the School Handbook as approved by the Governing Board. CA shall establish and administer the procedures necessary for the delivery of such tests and shall provide to the Governing Board information concerning the percentage of Students participating in the testing program to the extent that their participation is legally required.

3.4    Administrative Staff. While administrative staff are employees of the Charter School as provided for in Section 4.1(a), the Charter School shall contract with CA for human resources services including payroll and benefits administration for administrative staff. At the election of the Charter School, CA may also be engaged to provide recruiting services and professional development for administrative staff.

3.5    Community Coordinator(s) and Group Activities.  CA shall recruit Learning Coaches willing to volunteer their services to coordinate community activities that allow Students to apply their academic skills while interacting with other Students in their immediate geographic area ("Community Coordinator").  These activities will be opportunities for support, socialization and learning.  Prior approval for these events must be obtained from the Lead School Administrator and permission slips or signatures must be collected for each Student.  The main communication tool for Community Coordinators will be the message boards or other medium for such communications maintained by CA.  The Community Coordinator shall be responsible for posting timely and relevant information in these message boards, or other medium for such communications, moderating discussions and reporting any inappropriate or dangerous behavior to the Lead School Administrator or his or her designee.  Community Coordinators shall not be considered employees or contractors of CA or the Charter School. Neither CA nor the Charter School shall be responsible for providing transportation to these group activities or otherwise providing for the cost of such activities, unless otherwise agreed or mandated by the individualized education plans (IEPs) of Special Needs Students.  The local Community Coordinator shall work with Teachers, parents and Students to enrich the learning experience and distribute information about their local community.  CA shall be responsible for obtaining background checks required under state law or regulation for volunteers.

3.6    Teaching Staff.  While the Teachers are employees of the Charter School as provided for in Section 4.2, the Charter School shall contract with CA for human resources services including payroll and benefits administration.  At the election of the Charter School, CA may also be engaged to provide recruiting services and professional development for Teachers.

3.7    Educational Resource Center.  CA shall provide access to additional educational support staff in the areas of special education, gifted education and curriculum services with such staff being available to Teachers, Learning Coaches and Students, according to the terms of the School Handbook and other policies and procedures established by CA.  Such resources will be available via email and toll-free telephone during the School Calendar, during the hours of 9 a.m. to 6 p.m. Eastern Time.

3.8    Instructional Staff Support and Development.  All Teachers will receive access to all Instructional Materials supplied to Students as necessary to conduct their teaching responsibilities.  Teachers and Administrative Staff will be trained in the CA protocols.  CA will be reimbursed for any travel costs associated with such training.   In addition, continuing professional development will be provided as required to support the delivery of the Educational Services and shall be sufficient to allow Teachers to comply with applicable Idaho statutes and regulations that specify professional development requirements.

3.9    Learning Management System.  CA will provide to the Charter School a non-exclusive, nontransferable, royalty-free, limited license during the Term of this Agreement for the use of its Learning Management System ("LMS") by Administrative Staff, Teachers, Students, Learning Coaches and other individuals required to access the system in order to provide the Educational Services in this Agreement.  CA may update the features and functions of the LMS from time to time. CA represents and warrants that it is the sole owner of its LMS through which certain of the Educational Services are delivered and any content contained in the LMS is owned by CA and its vendors.  This Agreement does not constitute a transfer by CA to the Charter School,

6

Administrative Staff, Teachers, Students or Learning Coaches of any intellectual property rights in its LMS or any content contained in the LMS. All right, title, and interest in and to the LMS and any content contained in the LMS, including, but not limited to, copyright, patent, trade secret, and trademark rights will remain with CA and its vendors.

3.10    Internet Access.  Each Student shall have access to the Internet for a sufficient amount of time to complete the instructional program (including assignments, online communication and collaboration, research and access to supplemental online resources). The level of access required is determined by the nature of the curriculum (e.g., the amount of print material) and the developmental level of the child (e.g., what may be appropriate for an eighth grader may not be appropriate for a first grader). At a minimum, access will include one computer connected to the Internet per household. In the event that an Internet subsidy is approved for a household based upon criteria established by the Charter School and is included in an applicable Fee Schedule in accordance with Section 9, CA shall reimburse each Student's parent or legal guardian for all or part of the cost of Internet access at the rate specified in the Fee Schedule. Payment will be made in accordance with the policy outlined in the School Handbook. Any Internet subsidy provided may be updated from time to time with the approval of the Governing Board.

3.11    Technical Support and Maintenance.  CA shall provide technical support and maintenance of any computer hardware or software provided by it to Students toll-free via e-mail and telephone during the hours of 9 a.m. to 6 p.m. Eastern Time. CA will only be responsible for providing repairs according to the policies outlined in the School Handbook as approved by the Governing Board. For Students using their own computer hardware and software, CA shall provide technical support for non-CA supplied hardware and software initially to make sure that Students have the minimum requirements necessary to participate in the Educational Services and then shall continue to provide Technical Support as necessary to support the Students' use of the Learning Management System. CA may contract with outside vendors for the provision of technical support and maintenance as required herein.

3.12    Student Records.  CA shall provide maintenance of Student Records in accordance with state, local and federal requirements. CA shall maintain the confidentiality of all Students' records in compliance with applicable state, local and federal laws and regulations and pursuant to the confidentiality section of this Agreement. CA shall maintain such records as are required to comply with all attendance rules and apportionment requirements specified by applicable law or regulations. All Student Record information shall remain the property of the Charter School and to the extent not immediately available to the Charter School, shall be provided to the Charter School within five (5) business days of the Charter School's written request for such information. CA may retain a copy of such records subject to the confidentiality requirements of this Section.

3.13    Services to Special Needs Students.  CA and the Charter School shall work together to ensure compliance with applicable laws and regulations concerning services to Special Needs Students. CA shall be responsible for ensuring the provision of necessary special education programs and services, including development of IEPs, handling administrative proceedings and specialized services, submitting state or federal reports, applying for and administering supplemental funding and all other administrative services associated with the delivery of services to Special Needs Students. All such services will be provided in a manner that complies

7

with state and federal rules, regulations and policies.  If the amount received by CA from any source for the services provided under this Section is less than the costs of providing such services as requested by the administrative or teaching staffs, CA or the School Principal shall notify the Charter School in writing concerning such deficiency and shall document the basis for it.  If CA agrees with the recommended services, then CA and the Charter School shall share equally in the excess expense.  If CA does not agree with the recommended services, then it shall provide an alternate recommendation, which shall meet State and Federal guidelines to the Principal (or such other individual who is an authorized member of the IEP team) and the Governing Board.  If the authorized individual agrees with the CA recommendation, he or she shall so indicate to the Governing Board and then CA and the Charter School shall share equally in any excess costs.  If the authorized individual does not agree with the CA recommendation, then he or she shall so indicate to the Governing Board, and CA shall only be responsible for the amount that it proposed to pay in its recommendation and the Charter School shall be responsible for the remainder.

3.14    Office Facilities and Services.

(a)     The Charter School may contract with CA to provide and/or maintain in good working order one or more offices, capital equipment or furniture and fixtures.  Any office space provided or managed by CA shall be ADA-compliant and meet any other requirements of the Charter, Charter School Law, or regulation.  The locations, lease terms, and capital purchases required for all facilities provided under this Agreement will be subject to the approval of the Governing Board. CA agrees that it will have no beneficial financial interest in any approved lease.  All leases negotiated on behalf of the Charter School or entered into by CA on behalf of the Charter School shall contain a cancellation clause consistent with the requirements of the Charter, unless otherwise approved by the Governing Board.  In addition, in the event that this Agreement is terminated prior to its expiration, if CA has entered into the facility lease for the Charter School, CA shall have the unilateral option to assign any lease obtained on behalf of the Charter School to the Charter School and the Governing Board shall accept any such assignment, subject to landlord approval if such approval is required, and any capital equipment or furniture and fixtures owned by CA and located in the facility may be purchased by the Charter School at the then-current tax records book value. If CA has entered into the facility lease for the Charter School, CA shall permit Charter School to hold public meetings of the Charter School at such offices, without payment of rent.

(b)     If the Charter School does not elect to contract with CA to provide or manage its facilities and capital equipment, furniture and fixtures, then the Charter School shall be responsible for providing them at its own cost and shall ensure that access to any facility that it maintains shall be ADA-compliant. Further, liability insurance for any facility leased directly and/or managed by the Charter School and any capital equipment or furniture and fixtures owned by the Charter School will be the responsibility of the Charter School.

(c)     The Charter School may contract with CA to provide telephone service, data lines, including Internet access, and such other similar services used by personnel who are engaged in providing Educational Services under this Agreement.

3.15   Financial and Other Reporting. CA will provide treasury and accounting support for all CA activities under this Agreement and such other Charter School activities as may be reasonably requested by the Charter School. CA will be responsible for providing to the Governing Board any such reports as are required by law or regulation and will assist in providing any information required by the Chartering Authority, the Idaho Department of Education, or its auditors. Information on the performance of the school and its Students shall be provided to the Governing Board as required or upon request upon reasonable advance notice to enable the Governing Board to monitor CA's performance. CA shall also respond to requests for public records, subject to the ultimate control of the Charter School. Financial and other data will be available to the Governing Board separately from CA's operations or any other schools managed by CA.

3.16   Management of Hardware and Software. In the event that the Charter School leases any Hardware and/or Software from CA, CA will manage such Hardware and Software. In the event that the Charter School purchase its own Hardware and/or Software, it shall separately contract with CA for the management of such Hardware and/or Software unless the Charter School agrees in writing to provide management services comparable to those provided by CA and to assume all liability related to any failure by the Charter School to provide such management services.

3.17   Management of Instructional Materials. CA will provide for the management of the Tangible and Intangible Instructional Materials, which shall involve procurement, contracting, storage, fulfillment, and other services required to obtain and deliver such Tangible and Intangible Instructional Materials.

3.18   Other. CA will be responsible to provide such other services not specifically described herein but which are required by the Charter. CA will have the right to add applicable charges for any new or additional services not previously provided for under this Agreement or the Fee Schedule described in Section 9. To the extent that any of the terms, conditions, or provisions of the Charter conflict or are inconsistent with the provisions of any other paragraph or section of this Agreement, whether or not such inconsistency is expressed or noted herein, the provisions of such other section or paragraph of such Charter shall in all instances prevail over the provisions of this Agreement, subject to adjustment of the Fee Schedule to account for any new or additional services not covered by the Fee Schedule.

3.19   Non-delegable duties. Notwithstanding anything to the contrary in this Agreement, if any service, responsibility, duty, power or authority delegated by the Chartering Authority or the Governing Board to CA pursuant to this Agreement may not be so delegated under applicable law, such delegation shall be null and void and the parties shall adjust the financial terms of this Agreement accordingly.

**4.   Educational Services to be Provided by the Charter School**

In accordance with the Charter, the Charter School shall provide the following additional services:

4.1   Administrative Staff.

(a) <u>Lead School Administrator</u>. The Charter School shall employ a Superintendent as provided for by Idaho law who shall act as the Lead School Administrator. In addition, the Charter School may also employ one or more persons who shall be designated as the "Principal" or in the event there is not a sufficient number of Students to require a full time Principal, then a Teacher may be designated to act as the Principal until such time as there are a sufficient number of Students. . The Superintendent may also function as the Principal. The Lead School Administrator or their designee shall keep both CA and the Charter School informed of staffing decisions on a regular basis, and shall report to and be responsible to the Governing Board on collective bargaining matters. The Teachers shall report to the Lead School Administrator, or such individual as shall have been designated by him or her, and the Lead School Administrator shall work under the direction of the CA Chief Education officer, or his/her designee, subject to oversight by the Governing Board. The Lead School Administrator shall comply with CA practices and protocols in the delivery of the Educational Services and shall report regularly to CA as to the operation of the School.

(b) <u>Other Administrative Staff</u>. The Charter School may also employ one or more persons who shall be designated as Assistant Principals. Such staff shall report to the Lead School Administrator or his or her designee. Other Administrative Staff shall be employed in the same manner as Teachers and may also act as Teachers in addition to their other responsibilities.

(c) <u>Administrative Staff Evaluation and Performance Criteria.</u> No later than October 30 of each year of the Term, CA shall provide the Governing Board with recommended criteria for evaluating the performance of any Administrative Staff for the current Academic Year. These criteria shall comply with any state requirements and may be updated by mutual agreement of the Parties and further the use of these criteria shall not limit the Governing Board from including additional performance criteria in any staff evaluation. The Governing Board shall use these criteria to perform an annual evaluation of the Administrative Staff. The Governing Board may also request that CA provide it with an evaluation of the Administrative Staff as part of the evaluation process. The final results of the evaluations by the Governing Board will be provided to CA. Further, in the event that the Superintendent or any other Administrative Staff are employed under the terms of an employment agreement, the terms of such employment agreement shall be provided to CA for review and comment prior to executing such agreements and the terms of the agreement shall be consistent with any performance criteria established by this Section.

(d) <u>Approval of Administrative Staff</u>. The Charter School shall be responsible for reviewing and approving the selection of any Administrative Staff and determining their compensation. The Charter School may request that CA assist in recruiting any Administrative Staff subject to approval by the Governing Board. CA shall have the right to request that the Charter School replace any Administrative Staff in the event that CA is dissatisfied with his or her performance, and so notifies the Governing Board in writing, including the basis for the request. In that event, the Charter School shall promptly take steps to replace such Administrative Staff within ninety (90) days, or such time as shall be mutually agreed on by the Parties or the Charter School shall notify CA within ten (10) days of its receipt of the request, or such other time as mutually agreed to by the Parties in writing, that such Administrative Staff will not be replaced.

10

(e) <u>Human Resource Services</u>. CA will provide human resources services including recruiting, payroll (including paying the Administrative Staff directly, collecting and remitting taxes, etc), benefits administration, supervision and liability insurance, etc. CA agrees to require the submission of fingerprints for each Charter School employee or prospective employee, and to otherwise meet any other applicable regulatory requirements.

4.2    <u>Teaching Staff</u>.

(a)    <u>Employment of Teachers</u>. The Charter School will employ one or more persons designated as Teachers. The Charter School shall be responsible for recruiting, training, and assigning Teachers or may contract with CA to provide these services. All Teachers shall hold a valid Idaho teaching certificate, permit or other document required by Idaho Law. These requirements may be waived with the prior written approval of the Governing Board: (a) for Students enrolled in the accredited National Connections Academy private school in elective Courses for which there is insufficient demand to support a full-time Teacher, or (b) only with respect to electives, where there is no Idaho-certified teacher available to teach the Course. In order for Students to receive transfer credit for such Courses, it must be approved by the Governing Board. CA and the Lead School Administrator will have all day-to-day responsibility for the selection, supervision, oversight, discipline and dismissal of the Teachers.

(b)    <u>Human Resource Services</u>. CA will provide human resources services including recruiting, payroll (including paying the teaching staff directly, collecting and remitting taxes, etc), benefits administration, supervision and liability insurance, etc. CA agrees to require the submission of fingerprints for each employee or prospective employee, and to otherwise meet any other applicable regulatory requirements.

(c)    <u>Teacher Performance/Conduct</u>. The Governing Board may, at any time, request that the Lead School Administrator promptly investigate and take action to address any complaints or concerns regarding the performance or conduct of any Teacher. The Lead School Administrator shall provide a prompt report to the Governing Board and CA on any and all actions taken in response to such a request. In the event the Lead School Administrator fails to take timely action to respond to the complaints or concerns raised and make a report, or in the event the actions taken by the Lead School Administrator are deemed inadequate, the Governing Board may require the removal or replacement of a Teacher within sixty (60) days of any written request or immediately upon written notice in the event the Governing Board believes there is any illegal conduct, health or safety risk to any Student and so notifies the Lead School Administrator in writing. The Charter School will act in the best interests of Charter School and its pupils to require the discipline or discharge of a Teacher consistent with due process and requirements of Idaho law

4.3    <u>Insurance</u>. The Charter School shall comply with any insurance provisions as set forth in Section 14.

5.    <u>Eligible Students</u>.

5.1    <u>Admission Requirements</u>. Any child qualified under the laws of the state of Idaho for admission to a public school under this Agreement is eligible to become a Student subject to any

11

applicable limitations in law or regulation, and subject to verification of their residency or other requirements established by law or regulation.  CA will not charge tuition and shall not charge any other fees unless approved by the Charter School.  5.2   Priority.  Any limit on the number of Students who may enroll shall be communicated to interested parents and students prior to their enrollment, including any procedure for conducting a lottery.  Once enrolled, Students will not be required to reapply in subsequent Academic Years, but will need to complete information confirming their intent to return, in accordance with the terms of the School Handbook.

5.3   Recruiting and community education.  CA will be responsible for developing a plan for periodic community informational meetings and correspondence as required to recruit Students and to inform other interested parties about the Charter School.  All such recruiting and community education activities are subject to prior review and approval by the Governing Board.

5.4   Public website.  CA will maintain a public web site on behalf of the Charter School that will contain any information required by Charter School Law and which will describe the Educational Services.

5.5   Enrollment.  The Charter School delegates to CA responsibility for accepting Students into the School.  However the Charter School has no responsibility to pay CA for any Students who are admitted who are not eligible. CA shall maintain a list of the Students enrolled on behalf of the Charter School and shall provide such list to the Governing Board and/or Chartering Authority immediately upon request.  The list shall include all required information for the Student Record.

5.6   Full-time Status.  Students shall be permitted to enroll in the School exclusively on a full-time basis.  Dual or part-time enrollment will not be permitted except by prior written agreement by CA and the Charter School, and neither Party shall have any obligation to accept a dual or part-time enrollment or provide any payment for services provided by other parties.

5.7   Disenrollment.  A Student may withdraw from the Charter School at any time during the Academic Year.  Only to the extent permitted by Idaho law, Students who do not comply with the terms of the School Handbook may also be disenrolled.  CA will use its reasonable best efforts to collect any information required by law or regulation concerning a disenrolled Student's next school.  CA will report on the status of withdrawals and disenrollments to the Governing Board monthly during the Academic Year or whenever requested by the Governing Board. CA will be responsible for reimbursing any state and federal funds that it has received to the extent funding is disallowed as a result of a Student's disenrollment.

6.   **Term and Termination.**

6.1   The Term. The term of this Agreement shall commence upon the Effective Date and shall be for an initial period of five (5) years and shall expire on **June 30, 2015** (the "Initial Term").

6.2   Renewal. Upon expiration of the Term, this Agreement may be renewed, at the Charter School's option, for an additional term of five (5) years or such other renewal period agreed upon by the Parties and allowed by the applicable law or regulation.

6.3    Early Termination. This Agreement can only be terminated before its expiration as follows:

(a) by both Parties if they agree in writing to the termination;

(b) by either, if the other Party materially breaches this Agreement and fails to cure such breach within ninety (90) days following written notification of such breach from the other party, the non-breaching party may elect to terminate;

(c) by the Governing Board if it determines that there is an imminent risk to the health and safety of students, and CA does not remedy the risk immediately;

(d) by CA, if the payments to which CA is entitled under Section 9 of this Agreement, are materially reduced as a result of a change in funding provided to the Charter School or applicable law or regulations impose requirements that are materially different from those previously provided under this Agreement and CA is unable or unwilling to make the required changes;

(e) by either Party, if the Idaho Department of Education or other regulatory authorities impose requirements that are materially different than those specified in the Charter Application or those provided during the initial Academic Year, and CA is unwilling or unable to make any required changes to the Educational Products and Services;

(f) by the Governing Board, if it determine, after a Performance Review, that this Agreement should be terminated, the Governing Board may elect to terminate, after providing notice thereof to CA and ninety (90) days for CA to respond and to propose a cure to any alleged deficiencies in the Performance Review.  However, the Governing Board is under no obligation to accept the proposed cure;

(g) by CA, in the event that the Charter School does not agree to replace Administrative Staff that CA has requested be terminated according to section 4.1 (d).  However, such termination shall only be effective as of June 30 of the Academic Year in which the request to terminate occurs and CA shall be responsible to provide reasonable assistance to any successor and shall complete all services to which it was obligated to perform to complete any regulatory requirements of such Academic Year; or

(h) by either Party in the event that the Parties fail to agree on a Budget in accordance with Section 9.

6.4    Notice of Termination. In the event of a termination of this Agreement prior to its expiration, written notice by certified or registered mail, return receipt requested, no later than April 1 of the then current Academic Year shall be provided and shall list the reason(s) for termination and the effective date of the termination. Termination shall only occur at the end of an Academic Year except if such termination is the result of Section 6.3 (b), (c), (d), or (e) above.

6.5    Obligations on Termination.  In the event this Agreement is terminated by either Party for any reason: (a) CA shall assist and cooperate with the Charter School in transitioning the

13

provision of Educational Products and Services from CA to the Charter School or another service provider so as to minimize the disruption to Students, (b) each Party will promptly (not later than thirty (30) days after the effective date of termination, or as otherwise mutually agreed to by the Parties in writing) return to the other Party all Confidential Information, property and material of any type belonging to the other Party, including but not limited to, electronic versions, hard copies and reproductions and will not retain copies of any such property or material except as may be expressly permitted in this Agreement or required by applicable law, (c) all access to the LMS and other Educational Products and Services shall be discontinued, (d) CA shall provide copies of all Student Records to the Charter School not otherwise in the Charter School's possession at no additional cost , and (e) the Charter School shall pay CA all amounts due under this Agreement upon the earlier of their due dates or thirty (30) days after the effective date of termination, or as otherwise mutually agreed to by the Parties in writing.

**7.     Representation Regarding Non-discrimination.**

Neither CA nor the Charter School nor the Governing Board will discriminate against any person on the basis of race, creed, color, sex, national origin, religion, ancestry, sexual orientation or disability, or any other basis prohibited by federal or Idaho law.

**8.     Health and Safety**

CA specifically acknowledges that it shall adhere to the following standards regarding health and safety:

(a) Reporting child abuse or neglect of which it has reasonable suspicion, as required by state law;

(b) Adopting policies prohibiting the use of drugs, alcohol and tobacco on school grounds or at school events; and

(c) Complying with all state immunization laws.

**9.     Financial Terms.**

9.1     Payments.  The following shall represent the financial responsibilities between the Parties.

(a) As compensation for the Educational Products and Services provided by CA under this Agreement, CA and the Charter School shall negotiate in good faith a schedule of fees for services (the "Fee Schedule") for each year of the Term that shall apply to the following Academic Year.  Upon the approval of such Fee Schedule, the Parties shall acknowledge and agree that the amounts are reasonable, necessary and fair market value compensation for services rendered.  To the extent that the Fee Schedule includes any fees that are based on a "percentage of revenue", such fees shall be assessed against funds received by the Charter School from all governmental sources received by the Charter School whatever from source, whether from state, local, or federal government agencies, including but not limited to Title 1 funds, grants, income or other funding sources (the "Revenues" and together with all Revenues in a given Academic Year, collectively "Total Revenues").

(b) Any costs required by the Charter not specifically included in this Agreement shall be paid by the Charter School.

(c) The Parties may agree to have CA act as its payment agent for various other expenditures not included in the Fee Schedule. CA will be entitled to reimbursement for these expenses on a monthly basis as they are incurred upon the submission of appropriate documentation.

(d) CA will invoice the Charter School monthly according to the Fee Schedule. Payment will be due within five (5) business days of action by the Governing Board, which shall use its best efforts to review and approve invoices within thirty (30) days of receipt. CA may charge interest at the rate of one and one half percent (1.5%) per month for any invoices over sixty (60) days unless such failure to pay is the result of funds being withheld from the Charter School due to a failure by CA to perform under the terms of the Agreement, or if the Charter School has insufficient funds to pay the invoice as the result of outstanding receivables, deferred payment by the State of funding due, or if the Charter School is disputing any charges. The Charter School shall notify CA of the basis for any dispute within five (5) days of receipt of the invoice and shall work to resolve the dispute within thirty (30) days. All amounts other than any amount in dispute shall be paid according to the terms herein. Funds shall also be subject to adjustment based on any adjustments to Student counts as a result of an audit by the State of Idaho. Any differences in amounts that were previously paid under this Agreement as a result of such audits shall only be applied to or against the next payment or payments otherwise due under this Section.

(e) To the extent that any adjustments as a result of a state audit are the result of CA's failure to adequately perform its responsibilities under this Agreement or the Charter, CA will be required to either (i) return any required funds to the Charter School as required by the state funding authority or (ii) to the extent that funds are withheld from future payments to the Charter School, reduce payments otherwise due to CA by the amount that funding is withheld.

9.2     Budgets.  No later than the earlier of June 1 or fourteen (14) working days prior to any regulatory or Charter requirement to file a budget, CA agrees that it will present to the Charter School a balanced budget (i.e. not resulting in a cumulative net asset deficit) for the following fiscal year.  The Budget shall be in reasonable detail, shall meet all regulatory reporting requirements and shall be based on the applicable Fee Schedule.  In the event that the Charter School and CA do not agree with the proposed balanced budget, the Parties agree to work together in good faith to resolve any disagreements by the earlier of June 30 or such date as is required by any regulatory requirement or the Charter for the budget submission.

9.3     Sales Tax.  The Charter School shall provide CA with support that it is tax exempt.  To the extent that the Charter School is not tax exempt, the Charter School shall be responsible for federal, state, or local taxes assessed, if any, based on the Educational Products and Services provided to the Charter School under this Agreement. If any sales and use taxes are assessed on purchases made from CA, CA will provide a credit to the Charter School equal to the amount of the sales or use taxes paid by the Charter School.

**10.**   **Confidential and Proprietary Information.**

10.1    The Governing Board acknowledges that the programs, courses, assessments, individual lesson plans, and techniques for preparation of Personalized Learning Plans of CA and its vendors are proprietary in nature and the confidential and exclusive property of CA and its vendors. The Governing Board's access to this proprietary information is for the limited purpose and use as instructional material and monitoring of CA. Such access shall be revoked and all proprietary information returned upon termination of this agreement. The Governing Board has no right, by virtue of this Agreement or otherwise, to use or disclose the content of such property, except upon prior written approval from an officer of CA. The PLP will become student educational record and treated as a Student Record.

10.2    In the event that any proprietary or confidential information is disclosed, intentionally or otherwise to the Governing Board, its employees, agents or assigns, agrees to hold same in strictest confidence and not to disclose same to any other person for any reasons nor utilize same without prior approval.

10.3    Each party further agrees to use all reasonable efforts at its disposal to assure that its employees, agents or assigns are aware of the confidential and proprietary nature of the subject matter. Neither party shall disclose or utilize proprietary information or materials to any person for any reason without prior written approval by the other party. Both parties acknowledge that unauthorized disclosure of proprietary and confidential information may cause irreparable harm and may entitle the damaged party to injunctive relief in a court of competent jurisdiction.

10.4    Protection of Student Records. The Parties acknowledge and agree that under Idaho law, the Family Educational Rights and Privacy Act 20 U.S.C. § 1232g ("FERPA") and any regulations promulgated thereunder, each Party has certain obligations with regard to maintaining the security, integrity and confidentiality of "education records", as that term is defined by FERPA. The Parties agree that they shall perform their obligations under this Agreement in compliance with FERPA and any regulations promulgated thereunder. The Parties designate the staff, employees and volunteers who are providing educational and/or administrative services to the Student as agents of the Charter School having a legitimate educational interest and thus entitled to access to educational records under FERPA. The Parties shall also maintain Student Records in accordance with any other applicable state, local and federal laws and regulations.

10.5    Notwithstanding the foregoing, the Governing Board shall be permitted to make such disclosures, and CA shall make such information and facilities available, to Idaho's regulatory authorities and any other person as is required for the Governing Board and the Chartering Authority to comply with applicable laws and regulations, and in accordance with Section 3.15.

**11.**   **Ownership of Intellectual Property and Tangible Personal Property Supplied by CA.**

11.1    Intellectual Property. CA represents and warrants that it is the sole owner of the LMS and CA, its affiliates, and/or its contracted vendors are the owners of any Intangible Instructional Materials and other content contained in the LMS ("Content")  made available pursuant to

16

Section 2.2. The Charter School will acquire no rights in trademarks, patents, copyrights or trade secrets related to the LMS, the Intangible Instructional Materials or the Content by reason of the Charter School's use of the same in connection with this Agreement. In the event that Teachers and/or Administrative Staff are employed by the Charter School, the Charter School grants and agrees to cause its employees and agents to grant, to CA and its successors and assigns, the non-exclusive perpetual, irrevocable, worldwide and royalty-free license to use (including to provide Educational Products and Services), modify, market and create derivative works based upon any instructional or other copyrightable materials created by Teachers and/or Administrative Staff who are employees or agents of the Charter School, if any, without identifying or seeking the consent of the Charter School or any of its employees or agents. Any such derivative works created shall be the sole property of CA and its transferees.

11.2    Tangible Personal Property. This Agreement does not constitute a sale or other transfer to the Charter School of any Educational Products supplied by CA pursuant to Section 2. All right, title, and interest in and to such Educational Products will remain with CA.

11.3    Trademarks. CA is the owner of various trademarks, service marks, logos and/or trade names used in its business of providing Educational Products and Services, as specified on **Exhibit A** (collectively, the "Licensed Marks"). CA grants to the Charter School a non-exclusive, non-transferable, royalty-free license to use the Licensed Marks during the term of this Agreement solely in connection with the performance of this Agreement and subject to pre-approval of such use by CA. The Charter School agrees to make reasonable efforts to use of the Licensed Marks in accordance with CA's trademark usage guidelines provided by CA, the most up to date version of which can be found at www.connectionsacademy.com. CA retains all right, title and interest in and to the Licensed Marks and any related proprietary rights not expressly granted to the Charter School hereunder. All goodwill attributable to the Licensed Marks will inure exclusively to the benefit of CA. In the event of a termination of this Agreement, the Charter School agrees to terminate use of the Licensed Marks and amend any publicly recorded and unrecorded documents to remove the name "Connections Academy", the Connections Academy logo and any other Licensed Marks that may be contained therein within sixty (60) days after the effective date of termination, unless otherwise agreed to by the Parties.

## 12.    Indemnification.

12.1    To the extent not covered by insurance or barred by any state legislation, CA shall defend, indemnify and hold the Governing Board and their respective agents and employees harmless against and from all costs, expenses, damages, injury or loss (including reasonable attorney's fees) to which the Governing Board and their respective agents and employees may be subject by reason of any wrongdoing, misconduct, negligence, or default by CA, its agents, employees, or assigns in the execution or performance of this Agreement. This indemnification shall not apply to any liability claims or demands resulting from the negligence or wrongful act or omission of any Governing Board member, officer, agent, or employee. This indemnification, defense and hold harmless obligation on behalf of CA shall survive the termination of this Agreement. CA shall have the right, at its own expense, to participate in the defense of any suit, without relieving CA of any of its obligations hereunder.

17

12.2    To the extent not covered by insurance or barred by any state legislation, the Charter School shall defend, indemnify and hold CA and their respective agents and employees harmless against and from all costs, expenses, damages, injury or loss (including reasonable attorney's fees) to which CA and their respective agents and employees may be subject by reason of any wrongdoing, misconduct, negligence, or default by the Charter School, its agents, employees, or assigns in the execution or performance of this Agreement. This indemnification shall not apply to any liability claims or demands resulting from the negligence or wrongful act or omission of any CA officer, agent, or employee.  This indemnification, defense and hold harmless obligation on behalf of the Charter School shall survive the termination of this Agreement.  The Charter School shall have the right, at its own expense, to participate in the defense of any suit, without relieving the Charter School of any of its obligations hereunder.

12.3    <u>Indemnification Procedure</u>. The indemnified Party will: (a) promptly notify the indemnifying Party in writing of any claim, loss, damages, liabilities and costs, and for third party claims, (b) allow the indemnifying Party to control the defense, and (c) reasonably cooperate with the indemnifying Party in the defense and any related settlement negotiations. In addition to any defense provided by the indemnifying Party, the indemnified Party may, at its expense, retain its own counsel. If the indemnifying Party does not promptly assume the indemnified Party's defense against any third party claim, the indemnified Party reserves the right to undertake its own defense at the indemnifying Party's expense.

## 13.    Limitation of Liabilities.

In no event will the Governing Board and their respective employees or agents be responsible or liable for the debts, acts or omissions of CA, its directors, officers, employees, or agents.

In no event will CA and their respective employees or agents be responsible or liable for the debts, acts or omissions of the Charter School, its directors, officers, employees, or agents.

## 14.    Insurance.

CA will maintain and keep in force no less than substantially such amounts of insurance as are provided for in **Exhibit B** for any of its activities which may arise from operations under this Agreement, whether such operations are  by CA, or by any subcontractor or anyone directly or indirectly employed by any of them.  Such coverage will include worker's compensation insurance for any CA employees provided under the terms of this Agreement. As to the services provided by CA to the Charter School, the Charter School shall be included as an "additional insured" at no additional charge.

The Charter School will maintain and keep in force Director and Officer's Insurance in the amount of at least one million ($1,000,000) dollars, or more, if required by any Agreement with the Chartering Authority or by the Charter. The Charter School will maintain and keep in force no less than substantially such amounts of insurance as are provided for in **Exhibit B** for any of its activities which may arise from operations under this Agreement. Such coverage will include workers' compensation insurance for employees of the Charter School, personal injury, including death, and Liability and Property Damage Insurance for claims for any damage to any property of the Charter School or injury to the public. Any coverage offered to the Charter

18

School by CA shall meet the requirements of the Chartering Authority, the Charter or applicable law. CA shall be included as a "named insured" as to such coverage. The Chartering Authority shall be included as an "additional insured" for all coverage provided by CA under the terms of this Section.

15.   **Notices.**

Any notice, demand or request from one party to the other party hereunder shall be deemed to have been sufficiently given or served for all purposes if and as of the date it is delivered by hand, received by overnight courier, or within three (3) business days of being sent by registered or certified mail, postage prepaid to the parties at the following addresses:

To the Governing Board:          INSPIRE Connections Academy

                                 600 N. Steelhead Way, Suite 164

                                 Boise, ID  83702

                                 Attn: Chair, Board of Directors


If to CA:                        Connections Academy LLC

                                 1001 Fleet Street, 5th Floor

                                 Baltimore, MD 21202

                                 Attention: Barbara Dreyer,

                                 President


16.  **Compliance with Law and Regulation.**

The Charter School and the Governing Board shall conduct all such oversight activities as are required by the Charter School Law or other applicable law and regulation, including meeting any requirements in the Charter or imposed on it by its Chartering Authority, conducting all required board meetings in accordance with any applicable open meeting laws or regulations, and acting in compliance with its charter and bylaws.

19

17.   **Miscellaneous.**

17.1   <u>Severability</u>.  If any provision of this Agreement is held to be invalid or unenforceable, it shall be ineffective only to the extent of the invalidity, without affecting or impairing the validity and enforceability of the remainder of the provision or the remaining provisions of this Agreement.  If any provision of this Agreement shall be or become in violation of any federal, state, or local law, such provision shall be considered null and void, and all other provisions shall remain in full force and effect.

17.2   <u>Assignment of Agreement.</u>  The Previous Agreement, as superseded by this Agreement, is hereby assigned by CA to CAI effective as of the date of this Agreement and CAI hereby accepts such assignment and agrees to perform the responsibilities heretofore performed by "CA", or those of the "Party" or "Parties" under the Previous Agreement, as superseded by this Agreement. This includes CAI retaining the requisite insurance coverage set out in Section 14. The Charter School hereby consents to such assignment and agrees to henceforth accept performance exclusively from CAI.

17.3   <u>Successors and Assigns</u>.  The terms and provisions of this Agreement shall be assignable by either party only with the prior written permission of the other, which consent shall not be unreasonably withheld; provided that a change in control of CA shall not be deemed a violation of this Agreement.

17.4   <u>Complete Agreement; Modification and Waiver</u>.  This Agreement constitutes the entire agreement between the parties with respect to the matter contained herein and supersedes all prior and contemporaneous agreements, warranties and understandings of the parties.  There are no agreements, representations or warranties of any kind except as expressly set forth in this Agreement.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both parties.  No waiver of any of the provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

17.5   <u>Force Majeure</u>.  If any circumstance should occur that is not anticipated or is beyond the control of a party or that delays or renders impossible or impracticable performance as to the obligations of such party, the party's obligation to perform such services shall be postponed for a period equal to the time during which such circumstance shall extend, or, if such performance has been rendered impossible by such circumstance, shall be cancelled.

17.6   <u>No Third Party Rights</u>.  This Agreement is made for the sole benefit of the parties. Except as otherwise expressly provided, nothing in this Agreement shall create or be deemed to create a relationship among the parties or any of them, and any third party, including a relationship in the nature of a third party beneficiary or fiduciary.

17.7   <u>Professional Fees and Expenses</u>.  Each party shall bear its own expenses for legal, accounting, and other fees or expenses in connection with the negotiation of this Agreement.

17.8   <u>Governing Law</u>.  This Agreement shall be governed and controlled by the laws of the State of Idaho. Any legal actions prosecuted or instituted by any party under this Agreement

shall be brought in a court of competent jurisdiction located in the State of Idaho, and each party hereby consents to the jurisdiction and venue of any such courts for such purposes.

17.9    Counterparts.  This Agreement may be signed in counterparts, which shall together constitute the signed original agreement.

17.10   Compliance with laws, policies, procedures, and rules.  CA will comply with all federal and state laws and regulations according to the Charter School Law.

17.11   Interpretation of Agreement.  The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the manner dealt with in this Agreement.  Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties as set forth in this Agreement.

17.12   Headings; Exhibits.  The section headings contained herein are for convenience only and shall not in any way affect the interpretation or enforceability of any provision of this Agreement.  All schedules and exhibits to this Agreement are incorporated herein and shall be deemed a part of this Agreement as fully as if set forth in the body hereof.

17.13   Attendance at Meetings.  During the term of the Agreement between the Governing Board and CA, CA will have the right to designate an individual who shall have attendance rights at all board meetings at which the Charter School is discussed, including any closed or executive sessions.  Such rights are limited exclusively to attendance and provide no rights to participate without the express permission of the Governing Board.

17.14   Ambiguity. It is acknowledged that this Agreement is the product of negotiation between the parties hereto, and the fact that a particular party prepared the draft(s) or final form of this Agreement shall not be relevant in the construction or interpretation of this Agreement should any provision or portion of this Agreement be deemed to be ambiguous.

16.15   Survival. The rights and responsibilities of Sections 6.5, 9, 10, 11, 12, 13, 14, 15, 16 and 17 shall survive the termination of this Agreement.

17.16   Electronic Signatures. This Agreement and related documents may be accepted in electronic form (e.g., by scanned copy of the signed document, an electronic or digital signature or other means of demonstrating assent) and each Party's acceptance will be deemed binding on the Parties.  Each Party acknowledges and agrees it will not contest the validity or enforceability of this Agreement and related documents, including under any applicable statute of frauds, because they were accepted and/or signed in electronic form. Each Party further acknowledges and agrees that it will not contest the validity or enforceability of a signed facsimile copy of this Agreement and related documents on the basis that it lacks an original handwritten signature. Facsimile signatures shall be considered valid signatures as of the date hereof.  Computer maintained records of the Agreement and related documents when produced in hard copy form shall constitute business records and shall have the same validity as any other generally recognized business records.

21

IN WITNESS WHEREOF, the parties have the parties have caused this Agreement to be duly executed by their authorized representatives as of the Effective Date written above.

INSPIRE ACADEMICS, INC.                    THE CONNECTIONS ACADEMY, LLC

By: _McCahill_                             By: _Barbara Dreyer_

Title: _Board Chair_                       Title: _President_

Date: _7/14/10_                            Date: _2/20/10_


CONNECTIONS ACADEMY OF IDAHO, LLC.

By: _Barbara Dreyer_

Title: _President_

Date: _2/24/10_

# EXHIBIT B

SDE Approved 4/29/2011

## STATE OF IDAHO
## ADMINISTRATOR CONTRACT

THIS CONTRACT, made this 3rd day of August year of 2012, by and between INSPIRE Idaho Connections Academy Charter School Boise, Idaho ("the District"), and Thomas Falash ("the Administrator").

WITNESSETH:

1.  That the District hereby employs said Administrator to perform the duties of Manager of Special Education so designated by the District and to perform such other duties as specified by the District at any time during the term hereof, provided that the Administrator is properly certified and endorsed to perform said duties for a period of 1 year (12 months per year), beginning in the month and day of August 8th, year of 2012, through the month and day of June 30th, year of 2013, at a base salary of Fifty five thousand Six hundred and Eighty dollars and Seventy cents ($55,680.70), plus any additional annual increments, and such other monetary benefits accorded by the District to employees under contract for this position which may be described in a separate addendum. Said salary shall be paid in equal semi-monthly installments in the amount of $2,503.33 on the 15th and last business day of the month beginning on August 31st year of 2012, to June 30th, year of 2013, inclusive. You will receive a gross payment of $1,430.77 on August 31st in addition to your normal gross wages.

2.  In consideration of the promises and agreement of the District hereinbefore recited, the Administrator agrees to assume the duties above recited at Boise, Idaho on August 8th, in the year 2012, and to faithfully perform and discharge the same to the best of his/her ability and as directed by the District and to comply with the applicable laws of the State of Idaho, the duly adopted rules of the State Board of Education, and such regulations, directives and policies as the Board of Trustees may legally prescribe which are, by reference, incorporated in and made a part of this agreement the same as if set forth herein.

3.  The District shall review this Contract during the 2012-2013 year of performance hereunder to consider employing the Administrator beyond the last year designated in this contract.  If the District elects to employ the Administrator beyond the last year designated in this Contract, it shall offer the Administrator a new Contract that reflects the new terms of employment, unless one of the parties notifies the other party by the sooner of the date this Contract expires or the July 1st following the last school year of employment under this Contract, of the intent to discontinue employment.

4.  It is hereby mutually stipulated and agreed by and between the parties hereto that nothing herein contained shall operate or be construed as a waiver of any of the rights, powers, privileges, or duties of either party hereto, by and under the laws of the State of Idaho, otherwise than is herein expressly stated.

IN WITNESS WHEREOF the District has caused this Contract to be executed in its name by its proper officials and the Administrator has executed the same all on the date first above written.

Date: 08/08/2012                        Date: 8/8/13

_____                 By _____, CHAIRMAN
Administrator                           BOARD OF TRUSTEES
                                        Inspire Connections Academy   School District No. 457

                                        Attest: Marilyn Bowie
                                        SUPERINTENDENT OR CLERK

This contract form was prepared pursuant to Sections 33-513, Idaho Code, and approved by the State Superintendent of Public Instruction, as a contract which may be used by school districts.  Any other form must be approved by the State Superintendent, and reviewed for reapproval every three years.

# EXHIBIT C

SDE Approved 4/30/2013

# STATE OF IDAHO
# ADMINISTRATOR CONTRACT

THIS CONTRACT, made this 13th day of May year of 2013, by and between INSPIRE Idaho Connections Academy  Charter School Boise, Idaho ("the District"), and Thomas Falash ("the Administrator").

WITNESSETH:

1. That the District hereby employs said Administrator to perform the duties of Manager of Special Education so designated by the District and to perform such other duties as specified by the District at any time during the term hereof, provided that the Administrator is properly certified and endorsed to perform said duties for a period of 1 year (12 months per year), beginning in the month and day of July 1st, year of 2013, through the month and day of June 30th, year of 2014, at a base salary of Sixty Two Thousand Dollars  ($62,000) per year, plus any additional annual increments, and such other monetary benefits accorded by the District to employees under contract for this position which may be described in a separate addendum. Said salary shall be paid in the amount of $2,583.33 on the 15th  and last day of each month beginning in July, year of 2013, to June, year of 2014, inclusive.

2. In consideration of the promises and agreement of the District herinbefore recited, the Administrator agrees to assume the duties above recited at Boise, Idaho on July 1st, in the year 2013, and to faithfully perform and discharge the same to the best of his/her ability and as directed by the District and to comply with the applicable laws of the State of Idaho, the duly adopted rules of the State Board of Education, and such regulations, directives and policies as the Board of Trustees may legally prescribe which are, by reference, incorporated in and made a part of this agreement the same as if set forth herein.

3. The District shall review this Contract during the 2013-2014 year of performance hereunder to consider employing the Administrator beyond the last year designated in this contract.  If the District elects to employ the Administrator beyond the last year designated in this Contract, it shall offer the Administrator a new Contract that reflects the new terms of employment, unless one of the parties notifies the other party by the sooner of the date this Contract expires or the July 1st following the last school year of employment under this Contract, of the intent to discontinue employment.

4. It is hereby mutually stipulated and agreed by and between the parties hereto that nothing herein contained shall operate or be construed as a waiver of any of the rights, powers, privileges, or duties of either party hereto, by and under the laws of the State of Idaho, otherwise than is herein expressly stated, and that no property rights attach to this Contract beyond the term of this Contract.

IN WITNESS WHEREOF the District has caused this Contract to be executed in its name by its proper officials and the Administrator has executed the same all on the date first above written.

Date:_____

Date: 8/6/2013

By _____ , CHAIRMAN

Administrator

BOARD OF TRUSTEES

_____ School District No. _____

Attest: _____

SUPERINTENDENT OR CLERK

This contract form was prepared pursuant to Sections 33-513, Idaho Code, and approved by the State Superintendent of Public Instruction, as a contract which may be used by school districts.  Any other form must be approved by the State Superintendent, and reviewed for reapproval every three years.

# EXHIBIT D

Thomas W. Falash
2404 Kootenai
Boise, Idaho 83705

September 18, 2013

Ms. Tonya Wesley, HR Department
Connection Education LLC
1001 Fleet Street 5th Floor
Baltimore, MD 21202

Dear Ms. Wesley,

On September 5, 2013, I spoke to you regarding several issues to seek clarification of information dealing with Principal Gerald, PIP, and Inspire School Board action to place me on official probation.  At this time, I would like to bring to Connection Education, LLC's (along with all other legal names of the corporation) attention several serious violations of Idaho Code that have been previously brought to the attention of Principal Gerald Chouinard and Vice-Principal Wade Frogley several times during the 2012-2013 and 2013-2014 school year. Most recently, I was directed by Principal Chouinard not to bring up the issues since Principal Chouinard's focus was on the upcoming Department of Education Audit.  The issues are as follows from the Inspire Connections Academy Policy Manual in use & Tappen, PA adopted by the Inspire School Board.

**Legal Reference:**
1. Student Suspension-Inspire Policy NO:  543
   - Idaho Code Sections
     1. 33-205
     2. 33-209
   - Goss v. Lopez, 419, 419 U.S. 565 (1975)
   - Honig v. Doe, 108 S. Ct. 592 9 (1988)

**Legal Reference:**

2. Student Expulsion/Denial of Enrollment-Inspire Policy N0:  544
   - Idaho Code Sections:
   - 33-205
   - 33-209
   - 20-527

**Legal Reference:**

3. Discipline Student with Disabilities (IDEA)  Inspire Policy No:  545
   - IDEA Amendments of 2004.20 U.S.C. Chapter 33, Section 1415(k)
   - 34 C.F.R. Part 300
   - Honig v. Doe, 484 U.S. 686, 108 S. Ct. 592 (1988)

- IDAPA 08.02.03.60
- Idaho Special Education Manual, September 2001 (The *Idaho Special Education Manual, 2007*

**Legal Reference**

4. Disciplining Student with Disabilities (Section 504)-Inspire Policy NO:  546
   - Section 504 of the 1973 Rehabilitation Act
   - 29 U.S.C. Ch.16 Sacs 706(8) and 794-794b
   - 34 CFR Part 104
   - Idaho Code Section 33-205

**Legal Reference**

5. Gifted and Talented
   - Idaho Code 33-2003)
   - Gifted and Talented Rules and Regulations IDAPA 08.02.03.999
   - Akron (OH) City School Distr., OCR Letter, 119 IDELE 542 (1992)
   - Discipline of Students with Disabilities in Elementary and Secondary School, OCR, October 1996.

**Connection Education Policy**

6. Non-Connections Education Owned Computer Equipment
   - Vice-Principal purchased through outside CA funding/budget computers for staff use (netbooks, iPads, etc.) used by staff without being set up by Connections MIS Staff to ensure proper protocol for use, per Connections Policy utilizing VPN inside or outside the office.  Policy and policy (FERPA) violation.
   - Use of Non-Connections owned computers use at meeting outside the office network not utilizing VPN to provide secure access to Connection Education student data (Connexus) on an open network.  Policy and possible (FERPA) violation.
   - Allowing staff to use Non-Owned personal computers on the network to access student data (FERPA Violation).

Issues of Non-Compliance with Idaho Code and Federal Regulations, in which, students enrolled with Connections Education Academy, 600 N. Steelhead Way, Suit 164, Boise, Idaho 83704, was brought to the attention of Principal Chouinard and Vice-Principal Wade Frogley during the 2012-2013 and 2013-2014 and I was directed to drop the discussion and focus on my Special Education Manager responsibilities.

In May of 2013, I was called into Principal Chouinard's Office for meeting with Tonya Wesley, Jennifer Duket, newly appointed, but not directly in charge of Inspire, to inform me that I was being placed of a Professional Improvement Plan for the upcoming 2013-

2014 school year.  I questioned them at the time why Supervisor, Jerry Wilkes, was not present at the phone conference, but received no explanation.

 In addition, Principal Chouinard I was also informed that I was being placed on official Inspire Board probation.  I questioned why, and Principal Chouinard's response was, "Anyone receiving a performance rating, on 2.0 on a scale of 4.0, was to be placed on official board probation by Connection Education Policy.  I questioned the fact at another employ, which I worked with on a PIP, was not on official board probation, but was on three or more PIP's until being placed on official board probation in January 2013.

On September 17, 2013, Principal Chouinard called me into his office where Jennifer Ducket from Connections Education LLC, Principal Chouinard's supervisor was present. I was informed by Principal Chouinard would be recommending to the Inspire School Board for Notice of Recommendation for Discharge at meeting scheduled for later in the evening.  Principal Chouinard read a lengthy list of allegations that would be in the Notice of Recommendations for Discharge that he would be presenting to the Inspire Board.  I asked for a copy of the Notice of Recommendations for Discharge document, but was denied by Principal Chouinard and Jennifer Dukek.  Principal Chouinard asked for my keys and credit card.  The meeting ended and I left for the day being placed on administrative leave.

I believe all allegations and actions take against me by Principal Chouinard, Vice Principal Wade Frogley, selective staff members, and the Inspire School Board is a direct resulted from my questioning of Principal Chouinard and Vice-Principal Frogley's continued lack of actions to address the Non-Compliance mentioned above in : Idaho Codes, IDEA, and other Federal Required Regulations.  I believe the actions being taken are a personal retaliation toward me by Principal Chouinard, Vice-Principal Frogley, and selected staff due to the issues of Non-Compliance that I have raised.

 I believe the noted violations have existed from the initial start up of Inspire Connections Academy and continue today, even though I have raised the issue regarding continued violations to Principal Chouinard and Vice-Principal Frogley on several occasions during the 2012-13 and 2013-2014 school years.

It would be in Connections Education LLC best interest to investigate fully the continued Non-Compliance issues noted taking place at Inspire Connections Academy.  students, family, staff, and Idaho Taxpayers, deserve and should expect Inspire School Leadership and Connections Education LLC, to be in full compliance of all state and federal regulations.

Sincerely,

Thomas Falash

# EXHIBIT E



October 4, 2013

Thomas Falash
2404 Kootenai
Boise, ID 83705

Dear Thomas:

I am in receipt of the letter that you sent to my attention dated September 18, 2013. In your letter you indicate that you believe the recommendation of discharge to the INSPIRE board is a personal retaliation towards you by Principal Chouinard, Vice Principal Frogley, and selected staff due to the issues of non-compliance that you raised. Please be advised that the recommendation to discharge to the board is based on a combination of your performance in your role as Manager of Special Education as well as the multiple complaints that were received from employees directly to Human Resources. As I have been directly involved in this process, I can confirm that this was not a decision based solely on information provided by Principal Chouinard and Vice Principal Frogley.

In regards to your claim of the school violations, I will investigate the complaints that you outline in your letter and will follow up with you accordingly.

In the meanwhile, if you have any questions, please do not hesitate to contact me directly.

Tonya Wesley

*Tonya Wesley*

Sr. Employee Relations Manager
Connections Education
1001 Fleet Street
Baltimore, MD 21202
(443)529-1129

CON ED 000003